UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mable L. Maroney,  Case No. 3:14-cv-698

    Plaintiff

  v.  MEMORANDUM OPINION

William E. Slaise Jr., et al.,

    Defendants

This matter is before me on Defendants' motion for summary judgment (Doc. No. 46), Plaintiff's opposition (Doc. No. 46), Plaintiff's response (Doc. No. 55), and Defendants' reply (Doc. No. 56). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, Defendants' motion is granted.

### I. BACKGROUND

On August 27, 2013 at approximately 2:30 a.m., Mable Maroney was driving her vehicle to Lima Towers in Lima, Ohio to visit her boyfriend. The evening before, Maroney drank a single 24-ounce can of beer between 11:00 p.m. and midnight. As she was driving on South Main Street in Lima, she crossed over railroad tracks which caused her headlights to short out. Deputy William E. Slaise, Jr. of the Allen County Sheriff's Department was on road patrol duty and observed Maroney's vehicle travelling with the headlights off. Slaise activated his cruiser lights and performed a traffic stop. Maroney pulled her car over to the side.

Contemporaneous with activating his cruiser lights, the camera in Slaise's police cruiser began to record footage of the traffic stop. Before exiting his vehicle, Slaise notified the dispatcher

to advise he was conducting a traffic stop. Slaise then approached Maroney's vehicle and asked her if she knew why she had been stopped. In reply, Maroney asked whether it was her headlights. Slaise then asked whether Maroney had consumed alcohol. Maroney responded she had consumed a 24-ounce beer.

Slaise proceeded to converse with Maroney in an effort to detect whether she was under the influence of alcohol. Slaise observed Maroney's eyes to be bloodshot, that she slurred her speech, and he detected the odor of alcohol. Prior to asking Maroney to get out of the vehicle, a police cruiser operated by Sergeant Howard arrived on the scene. Slaise then asked Maroney to exit her vehicle and began administering field sobriety tests. During these sobriety tests, another police cruiser operated by Deputy Joseph arrived on the scene.

Slaise asked Maroney to perform a walk and turn test on the sidewalk. Maroney told Slaise she could not do this without staggering because she had two bones taken out of her pinky toe. At that point, Slaise informed Maroney if she did not do this test, he was placing her under arrest. Howard then went to the driver's side of Maroney's vehicle to retrieve the keys and secure her vehicle.

After Slaise patted Maroney down, Slaise handcuffed her. Maroney told Slaise she had shoulder surgery which made it difficult to put both hands directly behind her back. Slaise retrieved a second set of handcuffs to give Maroney more room after she was handcuffed. At the time Maroney was handcuffed, Sergeant Howard had moved from the driver's side of the vehicle to the passenger side. Deputy Joseph was very close to Slaise, and Maroney could see him out of the corner of her eye. Sergeant Howard was next to Joseph and while he could not see the handcuffs, he was able to observe Slaise' action of putting the handcuffs on. Maroney offered no resistance.

It is during the handcuffing that the parties' stories diverge. Maroney states that as Slaise was handcuffing her, he inserted his finger in her rectum. (Maroney Depo. Doc. No. 46-1 at p. 45).

2

Maroney stated Slaise inserted his finger so hard, she almost soiled herself. (*Id.* at p. 59). During her deposition, Maroney testified she reacted in a loud voice, saying, "Watch your finger." (*Id.* at pp. 49-50). Maroney stated she also said "That's my butt your sticking your finger up," and testified she repeated this several times over and over to herself and the other officer. (*Id.*) Maroney also testified that after she made these statements, Deputy Joseph made the statement, "He's a hothead," referring to Slaise. (*Id.* p. 53).

Slaise then transported Maroney in his cruiser to the Lima Police Department. At the police department, Maroney complained again of Slaise's behavior, telling Howard, "Tell your boy to stop putting his finger up my butt, or he put his thumb up my butt or something like that." (Howard Dep., Doc. No. 46-6, p. 20).

At the police department, Maroney estimates she was there approximately an hour and took a breathalyzer test. (Doc. No. 46-1 at p. 57). As Maroney was not charged with an offense, she was released and transported by Sergeant Howard to her boyfriend's house. During that ride, Maroney again complained to Howard about Slaise's conduct and Howard explained the procedure for filing a complaint. (Doc. No. 46-6 at pp. 34-36).

On September 5, 2013, Maroney filed a citizen's complaint with the Allen County Sheriff's Department complaining about Deputy Slaise's conduct as she was handcuffed.

In March 2014, Maroney filed this suit alleging violations of her civil rights under 42 U.S.C. § 1983 relating to the incident of September 2013. The Defendants remaining in this action are Williams Slaise, William Joseph, and Daniel Howard. Plaintiff alleges violations of her rights under the Fourth and Fourteenth Amendments for use of unreasonable force, against Slaise. She also alleges Defendants Howard and Joseph failed to intervene in the unreasonable use of force by Slaise against her.

All three Defendants move for summary judgment on the basis of qualified immunity.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## III. QUALIFIED IMMUNITY

Qualified immunity shields "government officials performing discretionary functions… from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The analysis employed by the Sixth Circuit in determining qualified immunity focuses on whether a constitutional right was violated and whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right.  *Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014), citing *Saucier v. Katz*, 533 U.S. 194 (2001).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court approved disregarding the mandatory analytical sequence adopted in *Saucier* and allowed district courts to "exercise their sound discretion in deciding which of the two prongs in the qualified immunity analysis should be

4

addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. While the order of these questions is left to the discretion of the district court, "if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Goodwin v. City of Painesville*, No. 14-3120, 731 F.3d 314, 321 (6th Cir. 2015) (citations omitted).

### IV. ANALYSIS

There is no dispute Slaise had probable cause to stop Maroney as he observed her driving without her headlights at 2:30 a.m. through Lima, Ohio. The dispute here is with Slaise's alleged conduct at the time he handcuffed Maroney after arresting her and prior to taking her to the Lima Police Department. Maroney alleges as Slaise handcuffed her, he inserted a finger in her rectum. Slaise disputes this allegation and officers Howard and Joseph also deny observing any such conduct by Slaise or a contemporaneous physical reaction from Maroney. Based on the deposition testimony alone and drawing all inferences in the light most favorable to the non-movant, this issue would be one of material fact which would be for the trier of fact to determine if a Fourth Amendment violation, in fact, occurred. *See Pillow v. City of Lawrenceburg, Tenn.*, 319 Fed. Appx. 347, 351 (6th Cir. 2008).

In this case, I am also presented with the dashboard video and audio of the traffic stop, which is an "added wrinkle." *Scott v. Harris*, 550 U.S. 372, 378 (2007). At the time Maroney was stopped by Slaise, his front dashboard camera was activated as was his lapel microphone. A copy of the dashboard video with audio was filed as an exhibit by the Defendants. (Doc. No. 47, Audio and Video Tape re: Maroney traffic stop). A copy of this DVD was also provided to Plaintiff's counsel. (Doc. No. 47-2).

The dashboard video begins with Slaise pulling up behind Maroney's car. Because of the way Slaise parked his police cruiser, the view from the camera is of the left or driver's side of Maroney's car, from the rear. The only video captured on the dashcam is that of Maroney exiting

5

her vehicle to walk to the passenger side where the operative events took place. There is no view of the right or passenger side of the vehicle visible on the dashboard camera. The audio from Slaise's lapel microphone captures the interaction between Slaise and Maroney during the traffic stop.

Unlike the plaintiff in *Scott*, I do not have a videotape version which can be used to corroborate the record for either side. I am left with the video tape recorder timeline which includes the audio tape of the traffic stop including the field sobriety tests, arrest, and handcuffing.

A somewhat analogous situation was presented in *Coble v. City of White House, Tenn.*, 634 F.3d 865 (6th Cir. 2011), which also involved an arrestee bringing an excessive force claim. Like the present action, those events were not captured on the videotape because the placement of the dashcam in the patrol car and the angle in which the patrol car was parked. The audio sounds recorded by the officer's microphone were relied on by the district court in finding the plaintiff failed to establish a genuine issue of material fact as noted by the appellate court:

> Listening to the audiotape, no reasonable jury could find by a preponderance of the evidence that [plaintiff] screamed during the first few steps while he was being escorted, that he called Officer Carney names to get him to stop walking, or that [plaintiff] "splattered" on the pavement. To the contrary, the audiotape reveals only the sound of shuffling bodies as if the three men were walking, and Coble was silent. After a few moments, Coble cried out that his leg was broken, and the shuffling stopped. An officer said, "Sit down!" There is no audible noise that once could associate with a body dropping or "splattering" to the pavement." . . . The testimony of Officers Carney and Bilbrey square with the audiotape, while [plaintiff's] testimony does not. Therefore, under *Scott*, the Court need not adopt [plaintiff's] version in ruling on the motions for summary judgment.

*Id.* at 867, citing *Coble v. City of White House, Tenn.*, No. 08-314, 2009 WL 2850764 (M.D.Tenn. Aug. 29, 2009).

In reversing the district court, the Circuit noted that in that circumstance, it was appropriate for the district court to consider the audio recording. *Id.* at 869. The Circuit, however, took issue

6

with the district court's finding that the plaintiff's testimony there was "blatantly contradicted" by the audio recording.

> The district court found that the audio recording blatantly contradicted [plaintiff's] deposition testimony that he screamed during the first few steps while he was being escorted, and called Officer Carney names to get him to stop walking. This finding was based upon the lack of any audible screams or name-calling on the recording. The district court also found that no reasonable jury could find that [plaintiff] "splattered" on the pavement because there was "no audible noise that once could associate with a body dropping or 'splattering' to the pavement." 2009 WL 2840764 at *11. *The lack of sound on an audio recording cannot be reliably used to discount [plaintiff's] testimony.* Many factors could affect what sounds are recorded, including the volume of the sound, the nature of the activity at issue, the location of the microphone, whether the microphone was on or off, and whether the microphone was covered. This case differs from *Scott* where there were no allegations or indications that the recording was doctored or altered in any way, or any contention that what it depicted differed from what actually happened. *Scott*, 550 U.S. at 378, 127 S.Ct. 1769. Here, in contrast to the plaintiff in *Scott*, [plaintiff] does not merely characterize the recording differently. Rather, [plaintiff] insists that the facts differed from what was recorded. [Plaintiff] testified that he screamed, that he called Officer Carney names, that he was forced to walk on his broken ankle, and that he was dropped face-first on the ground. His testimony is not "blatantly contradicted" by the lack of corroborating sound on the audio recording. A reasonable jury could believe [plaintiff's] version of the events.(Footnote No. 4).

*Id.* at 869-70. (Emphasis added). The footnote to the Circuit's ruling noted the following:

> 4. We do not suggest that discounting a non-movant's testimony at the summary judgment stage on the basis of an audio recording would never be appropriate. An audio recording may very well provide objectively compelling evidence, particularly when it is presented to show what sounds or statements were made. *See, e.g., Marksmeier v. Davie*, 622 F.3d 896, 900 (8th Cir. 2010) (finding no genuine issue of material fact for trial where the plaintiff's admissions, captured on audiotape, blatantly contradicted his version of the events). However, an audio recording is less reliable when it is presented to support findings based on the lack of recorded sound.

*Id.* at 871.

In this case, Maroney does not contend the audio tape was altered or does not reflect what actually took place during the traffic stop. The DVD playback reflects the following version of events regarding Maroney's traffic stop.

7

The Plaintiff is stopped by Slaise at 2:28 a.m. (Doc. No. 47, Second Clip at 2:28 a.m.). Slaise approaches her vehicle from the passenger side at 2:29 a.m. He then engages Maroney in conversation, asking if she knew why she was stopped. She responds that it has to do with her headlights. Still at 2:29 a.m., Slaise inquires if she had been drinking and Maroney affirms she had nothing but 2 beers. Slaise asks her if she is sure about that and then asks Maroney if she would mind taking a few tests. She says ok and then complains about having to get out of the vehicle. (*Id.* at 2:30 a.m.)

At 2:30 a.m., Maroney exits her car via the driver's side and proceeds around the rear of her vehicle. Slaise continues to converse with Maroney who asks if she is ok because she just dropped her keys. Maroney responds that Slaise is making her nervous. At 2:31 a.m. Slaise tells her why he thinks she is intoxicated because no reasonable person would drive their car without headlights at night and asks if she agrees. Maroney then tells Slaise she is driving to take care of someone and help them with their medication. Slaise expresses disbelief saying that does not make sense and then asks where Maroney is coming from and she gives him an address.

The audio portion captured by Slaise's lapel microphone captures him asking Maroney to agree to a field sobriety test and she agrees. The audio also captures the radio dispatcher relaying information regarding Maroney's criminal history. (Id. at 2:32 a.m.) Additionally, the audio captures a discussion with one of the other officers commenting on Maroney's past DWI and its vintage.

Discussion between Slaise and another officer takes place regarding the breathalyzer equipment. Slaise then asks whether Maroney would mind taking a breathalyzer test and she agrees. (Id at 2:33 a.m.) Slaise then tells her he is willing to cut her a break on the headlight issue if she will tell him how much she has had to drink. At that point Maroney indicates she has had *two* 24 ounce cans of beer. (Emphasis added).

8

Slaise then asks her who she works for and Maroney tells her she is retired. Slaise then tells her it is troubling that she is going to take care of someone after having drunk that much alcohol and he adds that he would not want her taking care of his mother in her condition. Maroney then proceeds to tell Slaise that her mother is deceased and died of cancer. Slaise then tells her that he does not think that her mother would approve of the current situation. (*Id.*)

At 2:34 a.m., one of the other officers reads her rights to her regarding the breathalyzer test and then directs her to blow into the device. He repeats the instructions asking her to blow harder.

At 2:35 a.m. Slaise asks where Maroney was heading when she was stopped. He then asks her when she imbibed the beers, she indicates about an hour before. One of the other officers comments that it might not have hit her yet.

At 2:36 a.m. Slaise then asks her if she will do another field sobriety test and Maroney agrees. Slaise tells her to put her purse down. Maroney can then be heard to be complaining about how Slaise was talking to her, brings up her deceased mother and how Maroney went through hell.

At 2:37 a.m. Slaise gives her instructions on how to do the walk and turn test. Maroney responds that she understands. Slaise tells her to begin and then at 2:37:48 a.m. Maroney tells Slaise to take her onto jail. Slaise asks if she is refusing to take the test. When Maroney indicates that she is refusing, he tells her to put her things on the roof of the car and he takes her keys. He then tells her to put her hands behind her back and interlace her fingers like she is praying. Maroney is told that her car will be locked up and not towed.

As Slaise prepared to handcuff Maroney, she is heard to say that it is hard for her to put her arms behind her due to her bad shoulders. (*Id.* at 2:37 a.m.). Slaise replies he will get another set of handcuffs to make it easier on her shoulders. (*Id.*) Maroney continues to talk about how her mother died of cancer.

9

Slaise then handcuffs Maroney who continues to talk about her mother. (*Id.* at 2:38 a.m.) The other officer can then be heard telling Maroney that he locked up her car and she thanks him for that. She then mumbles something about all this fuss over one drink. (*Id.* at 2:39 a.m.) Slaise expresses surprise because she has told him she had two 24 ounces of beer to drink.

At 2:40 a.m., Slaise directs Maroney to back into the backseat of his police cruiser, advising her to sit down, butt first, telling her to be careful as the seat is hard. Slaise then sits in the police cruiser filling out paperwork and Maroney complains about her shoulders. Slaise indicates he is filling out the paperwork as quickly as possible. Slaise then departs the scene with Maroney in the backseat at 2:46 a.m. headed for the Lima Police Department.

Between the time Slaise returns with the second set of handcuffs and Maroney is directed to sit in the police cruiser, there is no shouting or loud exclamation by Maroney toward Slaise or either of the other officers. Maroney can be heard throughout the video talking in a subdued voice and verbally indicating "um-hum" a number of times. There is a steady stream of conversation being recorded and the audio recording corresponds to both parties' versions of the stop, arrest and transfer to the police station except for the alleged physical intrusion upon Plaintiff's body.

Having carefully reviewed the DVD which contains both the video and audio of the traffic stop, I find that even when viewed in the light most favorable to the Plaintiff, no reasonable jury could find the Plaintiff suffered a constitutional violation under the Fourth or Fourteenth Amendment. As I find the Plaintiff has not established a constitutional violation to overcome qualified immunity, the Defendants are entitled to judgment as a matter of law.

## V. CONCLUSION

For the reasons stated above, the Defendants are entitled to qualified immunity as a matter of law. The Defendants' motion for summary judgment (Doc. No. 46) is granted as to all three remaining Defendants.

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge

Case: 3:14-cv-00698-JJH Doc #: 59 Filed: 03/08/17 11 of 11. PageID #: 1284